**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| NETWORK SYSTEM TECHNOLOGIES, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>TEXAS INSTRUMENTS INCORPORATED,<br><br>    Defendant. | Civil Action No. 2:22-cv-482-RWS<br><br>JURY TRIAL DEMANDED |

**TEXAS INSTRUMENTS INCORPORATED'S OPPOSITION TO PLAINTIFF'S
MOTION TO STRIKE AND EXCLUDE OPINIONS AND TESTIMONY OF
<u>DEFENDANT'S EXPERT MICHELE M. RILEY</u>**

████████████████████████████████████████

## TABLE OF CONTENTS

I.    ARGUMENT ........................................................................................................ 2

    A.    Riley's Rebuttals To NST's Expert's Royalty Base Are Admissible. .................... 2

        1.    No Exclusion Is Warranted In Relation To Licensed Customers. .............. 2

        2.    No Exclusion Is Warranted In Relation To Government Sales. ................. 5

        3.    Riley Appropriately Considered Potential Exclusion of Pre-Suit Sales. ........................................................................................................ 6

    B.    Riley's Opinions Based On Comparable Licenses Are Admissible. ...................... 7

        1.    Riley's Opinions Regarding the Arteris-TI License Are Admissible. ............................................................................................... 7

        2.    Riley's Opinions Regarding the Sonics-TI License Are Admissible. ............................................................................................. 11

II.    CONCLUSION ................................................................................................. 13

i

███████████████████████████████████████████████

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrade Garcia v. Columbia Med. Ctr. of Sherman*,
   996 F. Supp. 617 (E.D. Tex. 1998) ........................................................................................4

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) .............................................................................................7

*Blue Spike, LLC v. Huawei Techs. Co.*,
   No. 6:13-CV-679, 2016 WL 9286102 (E.D. Tex. Oct. 14, 2016) ...........................................8

*Cooper/T. Smith Stevedoring Co., Inc. v. Liuzza*,
   293 F.3d 741 (5th Cir. 2002) .................................................................................................3

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*,
   No. 2:22-CV-00125-JRG, 2023 WL 8281905 (E.D. Tex. Nov. 29, 2023).............................11

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
   109 F.3d 1567 (Fed. Cir. 1997).............................................................................................10

*Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*,
   881 F.3d 1323 (Fed. Cir. 2018).............................................................................................9

*Metaswitch Networks Ltd. v. Genband US LLC*,
   No. 2:14-CV-744-JRG-RSP, 2016 WL 874775 (E.D. Tex. Mar. 7, 2016) ............................11

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) .............................................................................................8

*SB IP Holdings, LLC v. Vivint, Inc.*,
   No. 4:20-CV-00886, 2023 WL 6601415 (E.D. Tex. Oct. 10, 2023) ......................................11

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*,
   No. 1-12-CV-00033-JRN, 2013 WL 12076934 (W.D. Tex. Nov. 8, 2013) ............................3

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014)........................................................................................11, 13

*WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,
   No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752 (M.D. Fla. July 14, 2022) ...................10, 13

███████████████████████████████████████████████

The first three objections raised in NST's motion to strike certain opinions of TI's damages expert, Michele Riley, (Dkt. 219 ("Mot.")) misunderstand the nature of Riley's testimony. *First*, NST suggests that Riley offered a "legal opinion" that certain third parties were licensed. Riley offered no such legal opinion, as was evident from (a) her report, (b) her further clarification in deposition testimony, and (c) TI's still further clarification in the parties' meet-and-confer. Riley opined, as damages experts frequently do, that *if the Court* finds these customers are licensed, *then* Bratic's royalty base should be adjusted to exclude TI's sales to such customers. NST's challenge here is both unfounded and moot. *Second*, NST challenges Riley's inclusion, in her rebuttal opinion, of a scenario where TI's sales to government contractors are not actionable under 28 U.S.C. § 1498. Riley's scenario was not improper, but that issue is also moot, as TI has clarified that it is withdrawing that defense, given the minimal nature of those sales, and to simplify the issues for trial. *Third*, NST challenges Riley's opinion quantifying TI's pre-suit sales that *TI contends* are not properly in the royalty base. Again, Riley offered no opinion that these sales should or should not be counted in the royalty base. Assuming the Court agrees with TI's contention, which has been presented in a motion for summary judgment, then Riley identified the commensurate impact on NST's damages calculation. NST identifies nothing improper about Riley accounting for this scenario.

*Finally*, NST seeks to exclude Riley's opinions regarding two probative real-world commercial licenses to system-on-chip interconnect technologies—including the Arteris NoC technology that forms the very basis of NST's infringement claims against TI. NST offers no valid reason why Riley's analysis of these arms-length TI licenses was improper. Riley's analysis was consistent with the Federal Circuit's guidance on how economic experts should assess comparability of licenses in computing damages. NST's Motion should be denied.

███████████████████████████████████████████

## I.    ARGUMENT

### A.    Riley's Rebuttals To NST's Expert's Royalty Base Are Admissible.

#### 1.    No Exclusion Is Warranted In Relation To Licensed Customers.

NST objects to Riley's damages "carve outs" for certain TI customers as "legal opinions," claiming that Riley is unqualified to offer these opinions and that the opinions are "contradict[ed]" by the agreements themselves. Mot. § III.A. NST's arguments are both moot and incorrect.

#### a)    NST's Objections Regarding Licensed Customers Are Moot.

As a threshold matter, Riley does not affirmatively "carve out" any alleged infringing sales. Mot. at 5. Through a diligent analysis of the record, including evidence regarding non-infringing alternatives, comparable licenses, and the Philips-NST Patent Purchase Agreement, Riley identified datapoints probative of the hypothetical license in this case. Ex. A (Riley Reb. Rpt.) ¶ 275. Then, after carefully analyzing the *Georgia-Pacific* factors (*id*. ¶¶ 277–340), she concluded that "the parties [would] determine a range for lump-sum reasonable royalties from $1 million . . . to $4.5 million." *Id*. ¶ 339. Her calculated reasonable royalty is a "lump-sum" payment, not a royalty per unit or as a percentage of revenue; it is unaffected by the number of units of accused products sold, or any "carveouts" thereto. *Id*.

Next, *in rebuttal*[1] to the opinion of NST's expert, Mr. Bratic, who opined that NST is owed a royalty of "$0.37 per chip," Riley observes that "the Bratic Report's royalty base includes several categories of Accused Chips sales that ***TI contends*** NST is not entitled to count towards damages." *Id*. ¶¶ 344–46 (emphasis added); *see also* Ex. C (Riley Reb. Rpt., Ex. 3.1 at n.1) ("TI contends that the customers listed above licensed the Patents-in-Suit outlined in the Patent Purchase Agreement between Network System Technologies LLC and Koninklijke Philips N.V"). These categories

---

[1] NST mistitled its brief as seeking to strike Riley's "Opening Report." Riley did not submit an opening report; her Mar. 5 report rebuts the Feb. 13 opening report of NST's expert, Mr. Bratic.

include pre-suit sales (~320 million units), extraterritorial sales (~315 million units), sales to licensed customers (~14 million units), and sales to the U.S. Government (~400,000 units).

Riley does not independently determine or opine whether particular sales should or should not be excluded from Bratic's royalty base; she only notes the impact that exclusion (by the Court or the jury) would logically have on his calculations: "Removing these categories of Accused Chips sales and accounting for the overlap among them reduces the Bratic Report's royalty base . . . from 371,091,378 units to 7,605,429 units . . . [and] reduce[s] the Bratic Report's damages calculation . . . from approximately $137.3 million to approximately $2.8 million." Ex. A (Riley Reb. Rpt.) ¶ 345. Riley's rebuttal opinions properly account for these alternative, contingent scenarios. *See, e.g.*, *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, No. 1-12-CV-00033-JRN, 2013 WL 12076934, at *2 (W.D. Tex. Nov. 8, 2013) ("It is well settled that an expert witness may provide an opinion that is contingent on facts to be proved or disproved at trial.") (citing *Cooper/T. Smith Stevedoring Co., Inc. v. Liuzza*, 293 F.3d 741, 749 (5th Cir. 2002)).

Contrary to NST's argument, Riley offers no "legal opinions" regarding license scope. Riley eliminated any potential ambiguity on this point at her deposition by confirming that she would not affirmatively testify whether certain sales are (or are not) licensed:

> Q. So at trial, are you going to offer testimony about what products are licensed or not licensed under the agreements that you refer to in . . . your report?
>
> A. So from a – a royalty – well, from any perspective on these license defense issues, it would – I believe in my experience, it would – it ***will have been decided*** *before I would testify as to what is licensed . . . because the court always has to weigh in on those things* . . . So, you know, I don't know what would be decided one way or the other . . . And, of course, *I **would be respectful** of that*.

Ex. D (Riley Tr.) at 154:16–155:8 (emphases added).

Thus, TI was surprised to learn, during the meet-and-confer process, that NST intended to move to strike "legal conclusions" of Riley. Seeking to avoid this very dispute, TI provided further reassurances:

> **Paragraphs 86–87**: TI clarifies that Ms. Riley will not offer any legal opinions on whether any of TI's sales to Philips, Siemens, Hitachi, Microsoft, NEC, Nokia, Toshiba, or Sony were in fact authorized under any asserted patent. She will instead note *TI's contention* that some or all of these sales were authorized, and describe how the fact-finder's or the court's determination (accepting or rejecting TI's contention) might impact her calculations. We trust that this clarification resolves NST's objections . . . but please let us know of any residual concerns.

Ex. E (Sood 4/30 Email).

NST did not respond to TI's email, and went ahead with its motion, claiming the parties "conclusively reached an impasse" (Mot. at 14), and neglecting to mention both Riley's testimony and TI's meet-and-confer clarifications. Because NST's objections are moot, the Court should overrule them. *See, e.g., Andrade Garcia v. Columbia Med. Ctr. of Sherman*, 996 F. Supp. 617, 621 (E.D. Tex. 1998) (denying *Daubert* motion as moot in light of defendant's representations).

    *b)*   *NST Misstates TI's Contentions Regarding Licensed Customers.*

Mootness aside, NST is also wrong that certain TI customers cannot be licensed because "TI is not a signatory, nor a third-party beneficiary" of the Philips licenses at issue. Mot. § III.A.2. NST references its Motion for Partial Summary Judgment on TI's Fifth Affirmative Defense (Dkt. 220) for this argument; accordingly, TI will respond to this argument in full in its forthcoming response to that motion. Briefly, NST's argument misses the point because TI's contention does not depend on whether TI is the signatory or beneficiary of a license. Instead, TI's contention is based on the rights of NST's licensees. *See* Dkt. 213 (TI's Motion for Summary Judgment on Liability and Remedy Issues), §§ III.D–E. To illustrate, TI's sales to Philips (NST's predecessor-in-interest) cannot create indirect liability for TI as (1) Philips could not directly infringe patents

4



it owned, and (2) even after Philips sold the patents to NST, ████████████████████ ████████. *Id*. Further, TI's sales to Philips could not create direct liability for TI as Philips impliedly authorized those sales as the owner of the patents, and then, ████████████████ ████████████████████████████ *Id*. Similarly, as to Hitachi, TI's *non-U.S.* sales could not directly infringe a U.S. patent; and to the extent Hitachi imported into the U.S. and domestically used any accused products, it was ████████████████████ by NST's predecessor, and thus, TI could have no indirect liability in relation to the same. *Id*. at 24.

### 2.  No Exclusion Is Warranted In Relation To Government Sales.

As with the licensed customers issue, NST misconstrues Riley's testimony in suggesting that Riley offers her own legal conclusions about excluding certain TI sales to government contractors. Mot. § III.B. Riley's report was clear that she was only accounting for a potential scenario where such sales would be excluded *if* the Court accepted TI's contentions. She further clarified at her deposition that she was "not going to affirmatively testify whether those sales are part of the royalty base or not." Ex. D (Riley Tr.) at 161:17–24. And in the meet-and-confer process, TI offered the following further clarification:

> **Paragraphs 88–89**: TI clarifies that Ms. Riley will not offer any conclusions on whether any of TI's sales to L3 Harris, RTX (formerly Raytheon), Lockheed Martin, Northrop Grumman, General Dynamics, Bae Systems, Leonardo or Elbit Systems constitute a sale to the U.S. Government for purposes of 28 USC 1498. She will instead note *TI's contention* that some or all of these sales were to the U.S. Government, and describe how the fact-finder's or the court's determination (accepting or rejecting TI's contention) might impact her calculations. We trust that TI's clarification resolves NST's objections . . . but please let us know of any residual concerns.

Ex. E (Sood 4/30 Email). Accordingly, Section III.B of NST's Motion was unnecessary. Beyond that, given the relatively small number of impacted sales (~400,000 units), and in the interest of narrowing issues for trial, TI has subsequently withdrawn its § 1498 defense and confirmed in

5

writing that Riley will not testify at trial regarding exclusion from Bratic's royalty base of sales to the U.S. Government. Ex. F (Sudarshan 5/9 Email). This independently moots NST's objections.

### 3.    Riley Appropriately Considered Potential Exclusion of Pre-Suit Sales.

NST needlessly objects to Riley's consideration of two alternative rebuttal scenarios: one where pre-suit sales are excluded from Bratic's royalty base, and another where they are not. Mot. § III.C. As with the licensed customer issue (*supra* I.A.1), NST cites no case law suggesting that a damages expert cannot account for the different potential liability scenarios presented by unresolved issues in a litigation. That is all Riley has done; as Exhibit 1 to her report shows, Riley accounts for various potential "royalty base scenarios," including ones where pre-suit sales are *included*. Ex. B (Riley Reb. Rpt., Ex. 1) at Rows 9–16. NST again neglects to mention TI's meet-and-confer clarification which mooted NST's concerns:

> **Paragraphs 344–345, Exhibit 1**: As above . . . TI clarifies that Ms. Riley will not offer any opinions or conclusions on whether certain pre-suit sales should be counted in the royalty base; she will instead note *TI's contention* that such sales should be excluded, and describe how the fact-finder or court's determination (accepting or rejecting TI's contention) might impact her calculations. We trust that TI's clarification resolves NST's objections . . . but please let us know of any residual concerns.

Ex. E (Sood 4/30 Email).

NST is also wrong that Riley does not explain the scenario excluding pre-suit sales. Mot. at 9. In fact, Riley's report (p. 33 n. 184, ¶¶ 81–83) acknowledges TI's contentions that NST may not recover for any alleged pre-suit infringement because: (1) for the '818 patent, NST asserts apparatus claims, but cannot prove TI had actual or constructive pre-suit notice under § 287(a) (*see* Dkt. 213 at 18–21 (TI seeking summary judgment on this issue)); and (2) for all other asserted patents, for "reasons related to indirect infringement and no pre-suit knowledge, TI contends that NST is more broadly not entitled to damages prior to the complaint in this case." *See id.* at 15–17

6

(seeking summary judgment of no direct infringement of NST's asserted method claims); Dkt. 95 (Court dismissing pre-suit indirect infringement claims). Thus, while Riley will not herself opine on whether pre-suit sales should be counted, she appropriately summarizes TI's contentions in this regard. *See, e.g*., Ex. A (Riley Reb. Rpt.) ¶ 81 ("According to TI, 'NST's predecessor-in-interest . . . and their licensees (*e.g*., NXP and Samsung) failed to mark practicing products, and NST has not met its burden to show § 287 does not apply."). NST does not explain why any further explanation of these contentions, the merits of which Riley has *not opined on*, was necessary.

**B.    Riley's Opinions Based On Comparable Licenses Are Admissible.**

1.    Riley's Opinions Regarding the Arteris-TI License Are Admissible.

a)    *The Arteris-TI License includes a patent license.*

Riley's opinions relating to the license agreement between Arteris, Inc. and TI dated October 15, 2007, ("Arteris-TI License" (Ex. J)) are highly probative of the hypothetical license in this case. Contrary to NST's arguments in § III.D of its Motion, Riley is qualified to offer opinions on this hypothetical license informed by the real-world Arteris-TI License—a methodology that is reliable and consistent with Federal Circuit precedent.

"Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–73 (Fed. Cir. 2020). As for technical comparability, NST does not (and cannot) dispute that the Arteris-TI License is comparable as it concerns *the* very technology at issue in this case (*i.e*., the Arteris NoC interconnect technology). *See, e.g.*, Ex. G (Iglesia Op. Rpt.) ¶ 89 (claiming infringement based on TI's "incorporation, implementation, use, and functionality of Arteris NoCs, which embody the infringing elements of the Asserted Patents.").

██████████████████████████████████████

Riley showed that the Arteris-TI License is also economically comparable because TI signed it shortly prior to the hypothetical negotiation in relation to the very products accused of infringement in this case, and the agreement contemplates a royalty based on those same products. *See, e.g.*, Ex. A (Riley Reb. Rpt.) ¶¶ 231–52, 258–61, 267–75, 282–83, 376–77. Thus, Riley reliably opines that the Arteris-TI License provides a data point "that would help inform the negotiators of the relative value placed on the technology acquired related to TI's use of interconnects in its Accused Chips . . . The negotiators would recognize that, in total, TI has paid approximately $9.8 million under the Arteris Agreements to implement the Arteris interconnect technology solution. These payments amount to no more than . . . $0.01 per TI chip." *Id.* ¶ 267.

Riley also accounts—as she "must" under the law—for differences between the Arteris-TI License and the hypothetical license. *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed. Cir. 2021) (prior licenses "need to be sufficiently comparable . . . any differences in circumstances *must be soundly accounted for*.") (cleaned up, emphasis added); *Blue Spike, LLC v. Huawei Techs. Co.*, No. 6:13-CV-679, 2016 WL 9286102, at *4 (E.D. Tex. Oct. 14, 2016) (striking opinions where expert failed to account for differences). For example, a difference Riley observes is that, in addition to a patent license, the Arteris-TI License provided TI "software tools, libraries, and supporting documentation" (Ex. A (Riley Reb. Rpt.) ¶ 246)), along with access to "trade secrets, databases, know how, inventions, improvements, discoveries, conceptions, ideas, techniques, designs, . . . drawings, diagrams," among other things. *Id.* ¶ 250. Besides the language in the agreement, Riley cites the testimony of TI corporate representative Mr. Frank Cimino, an in-house lawyer who negotiates licenses for TI. *Id.* ¶¶ 250, 252; *see also* Ex. H (Cimino Tr.), at 79:12–80:9 ("for the most part," TI licenses do not concern "interconnect patents"; the Arteris-TI License is an exception, "but that's not a pure patent agreement."). "By way of comparison," Riley

8

observes, "the hypothetical license between TI and Philips for the Patents-in-Suit would be for a bare patent license to five U.S. patents for use within the U.S." Ex. A (Riley Reb. Rpt.) ¶ 257.

By contrast, NST's expert (Mr. Bratic) concluded that the Arteris-TI License contains no patent license and thus cannot be relevant. *See* Ex. I (Bratic Op. Rpt.) ¶ 112; Mot. at 11. Bratic disregards this license in proposing a royalty *~37 times* that of the Arteris-TI License. *See* Ex. I (Bratic Op. Rpt.) ¶ 10 (proposing $0.37 per unit royalty rate); *cf*. Ex. A (Riley Reb. Rpt.) ¶ 267 (effective royalty rate of Arteris-TI License is "$0.01 per TI chip."). NST now urges the Court to adopt Bratic's view that TI received no patent license from Arteris, and to exclude Riley's opinions. (Mot. § III.D).

Both Bratic and NST are wrong, as they both ignore the explicit text of the Arteris-TI License that demonstrates this error. As a page NST omitted from its moving papers shows, TI received from Arteris a "grant[]" of a "license under all applicable Intellectual Property Rights of Arteris" Ex. J (Arteris-TI License) § 2.1; *cf*. Mot. Ex. 3 (NST's exhibit omitted § 2.1), wherein "Intellectual Property" is explicitly defined to include "patent rights." Ex. J (Arteris-TI License) § 1.20. Thus, Arteris' authorization for TI "to Use the Licensed Technology" (Ex. J (Arteris-TI License) § 2.1)), which includes "all Intellectual Property of Arteris embodied within [the] Deliverables" (*id*. § 1.19), prevents Arteris from suing TI for patent infringement based on TI's use of those Deliverables. This, by definition, is a patent license. *See, e.g*., *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1329 (Fed. Cir. 2018) (a patent license is "in essence nothing more than a promise by the licensor not to sue the licensee."); *see also* Dkt. 210, 8–10 (TI seeking exclusion of Bratic's conclusion, based on Internet rumors and misreading contract language, that the Arteris-TI License was narrow and excluded patents). It is uncontested that Arteris has long owned patents directed to its NoC interconnect technology licensed to TI (and

9

████████████████████████████████████████████

now accused by NST). For example, in 2006, the year prior to the Arteris-TI License, named inventor Dr. Goossens wrote in a competitive analysis document about NoC interconnects that ████████████████████████████████ Ex. K (Exhibit 24 to Goossens Deposition) at 25; *see also* Ex. A (Riley Reb. Rpt.) ¶ 260 n.723 ("According to Google Patents, there are over 100 patents and patent applications that list Arteris as the assignee."). It is illogical to assert, as NST does, that, in licensing 'off-the-shelf' technology from an entity that owns relevant patents, TI (or any practicing entity) would contract to *exclude protection* from patent claims arising from its use of the licensed technology. *Cf.* Ex. H (Cimino Tr.) at 76:7–78:1 ("They couldn't sue us for using the product that they gave us, right.").

NST's arguments in this regard are unintelligible. NST asserts that, because the Arteris-TI License did not grant TI "any right, title, or ownership interest" in the Licensed Technology, patents stand "explicitly carved out of any transfer of ownership rights." (Mot. at 11.) But a license (promise not to sue) requires no "transfer of ownership rights." *See Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997) ("title to the patent does not change hands under a license agreement[,]" while "assignments pass title"). Riley's opinion is consistent with the agreement and governing law and is, therefore, admissible.

b) *NST's other arguments are equally meritless.*

NST's observation that the Arteris-TI License "does not even mention the Asserted Patents" is inconsequential. Mot. at 11. Arteris licensed ***its own patents*** to TI. NST's argument that an agreement cannot be relevant if it licenses technology other than the patents asserted in a case, but this premise contradicts established precedent. "[T]he Federal Circuit has instructed that testimony regarding the technological comparability of patents from a past license agreement and the patent in suit is reliable even where those licenses did not 'relate to the actual patents-in-suit' but instead 'were drawn to related technology.'" *WhereverTV, Inc. v. Comcast Cable Commc'ns,*

10

*LLC*, No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752, at \*5 (M.D. Fla. July 14, 2022) (quoting

*Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)).

NST's portrayal of Riley's opinions as legal conclusions also fails. Mot. at 10. "[O]pinions

do not become legal conclusions simply because [the expert] is relying on contracts to form them."

*Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-CV-00125-JRG, 2023 WL

8281905, at \*5 (E.D. Tex. Nov. 29, 2023) (technical expert "certainly qualified to read the plain

language of a contract"). Riley's discussion regarding the Arteris-TI License is admissible

because, as shown above, it relates to *economic* comparability testimony that the Federal Circuit

has mandated in the context of comparable license analysis. *See SB IP Holdings, LLC v. Vivint,*

*Inc.*, No. 4:20-CV-00886, 2023 WL 6601415, at \*11 (E.D. Tex. Oct. 10, 2023) (refusing to strike

where expert "did not use licenses to 'construe contract terms' but instead to 'opine on the

hypothetical negotiations between the relevant parties'"); *Metaswitch Networks Ltd. v. Genband*

*US LLC*, No. 2:14-CV-744-JRG-RSP, 2016 WL 874775, at \*2 (E.D. Tex. Mar. 7, 2016)

(economist's "analysis necessarily require[d] him to analyze the scope and nature of the alleged

FRAND commitment and to give his opinions about its economic effect. An analysis of this type

does not constitute improper legal opinion."). NST has shown no erroneous legal assumptions in

Riley's opinions and no exclusion is warranted.[2]

    2.    <u>Riley's Opinions Regarding the Sonics-TI License Are Admissible.</u>

NST's objections to Riley's opinions regarding the "Technology License Agreement"

between Sonics, Inc., and TI dated January 31, 2003 ("Sonics-TI License") (*see* Mot. § III.E) fail

---

[2] NST concludes its section regarding the Arteris license by asking that "the inclusion of pre-suit sales in the damages analysis . . . be stricken." *Id*. at 12. TI assumes that this is a copy-paste error, and that NST meant to request relief in relation to Riley's opinions about the Arteris-TI License, which TI opposes for the reasons stated herein.

for similar reasons as above. The Sonics-TI License is probative of the hypothetical license in this case. Sonics competed with Arteris in developing and supplying interconnect technology to chipmakers like TI. *See, e.g*., Ex. J (Arteris-TI License) at Exhibit D. Indeed, the "Sonics MX" interconnect is a non-infringing alternative to the accused Arteris NoC interconnects, and contemporaneous documents of NST's predecessor (Philips) and the inventor (Dr. Goossens) recognized the availability and suitability of this alternative as of February 2006. *See, e.g*., Ex. L at DR_GOOSSENS0004348 at 21 (Goossens describing Sonics MX as Philips' "main competitor" with respect to interconnect technologies). The Sonics-TI License is therefore probative of the industry rates for licensing the type of technologies at issue in this case. As Riley opines, TI and Philips "both understood that Sonics was one of Arteris' main competitors in the interconnect solutions space," and both would understand "that the amount [TI] paid for a license to Sonics technology would be an important data point for the negotiators to understand in determining the value attributable to the Patents-in-Suit." Ex. A (Riley Reb. Rpt.) ¶ 268.

Like the Arteris-TI License, the Sonics-TI License included a patent license. TI received from Sonics, in § 5.1, a "license under the Intellectual Property Rights of Sonics," with "Intellectual Property Rights" defined in § 1.4 as including "all patents and patent applications." Mot. Ex. 4. Thus, NST's criticism that Riley "extrapolates" (Mot. at 12) that the license includes patents is baseless and contradicted by the terms of the agreement. NST's criticism that the Sonics-TI License fails to convey rights to the Asserted Patents is similarly inconsequential. Sonics licensed its own patents to TI. As discussed above, a license may be relevant to an expert's analysis of a hypothetical negotiation if the technologies at issue are comparable, even if that license grants rights to patents *other than* the asserted patents. *WhereverTV*, 2022 WL 2751752, at *5 (quoting *Virnetx*, 767 F.3d at 1330).

████████████████████████████

## II.   CONCLUSION

For the foregoing reasons, the Court should deny NST's Motion in its entirety.

Dated: May 15, 2024

*/s/ Ranganath Sudarshan*

Robert T. Haslam (lead counsel)
rhaslam@cov.com
Anupam Sharma
asharma@cov.com
Hyun S. Byun
hbyun@cov.com,
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Ranganath Sudarshan
rsudarshan@cov.com
Tarek Austin
taustin@cov.com
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5346
Facsimile: (202) 778-5346

Udit Sood
usood@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Ste 5400
San Francisco, CA 94111
Telephone: 415-591-6000
Facsimile: 415-591-6091

Amanda Abraham
aa@rothfirm.com
The Roth Law Firm
115 N. Wellington, Suite 200

13

P O Box 876
Marshall, TX 75671-0876
Telephone: 903-935-1665
Facsimile: 903-935-1797

Wesley Hill
wh@wsfirm.com
Andrea Fair
andrea@wsfirm.com
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: 903-757-6400
Facsimile: 903-757-2323

*Attorneys for Defendant*
*Texas Instruments Incorporated*

14

**CERTIFIC7ATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of the foregoing document via electronic mail and notice via the Court's CM/ECF system per Local Rule CV-5(a)(3) this 15th day of May 2024.

*/s/ Ranganath Sudarshan*
Ranganath Sudarshan

15